UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

GREGORY TOBER,                    )
STACI TOBER, and                  )
ANNA MARIE TOBER,                 )
          Plaintiffs,             )
                                  )
     vs.                          )          1:02-cv-1682-LJM-WTL
                                  )
GRACO CHILDREN'S PRODUCTS, INC.,  )
          Defendant.              )


## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO EXCLUDE EXPERT TESTIMONY

This matter comes before the Court on Defendant's, Graco Children's Products, Inc. ("Defendant" or "Graco"), Motion for Summary Judgment on the claims of Plaintiffs, Gregory Tober, Staci Tober, and Anna Marie Tober ("Plaintiffs"), and on Defendant's Motion to Exclude the Expert Testimony of Dr. Way Johnston ("Dr. Johnston"). Plaintiffs seek to recover for the fatal injuries suffered by their infant son/brother Trevor Tober ("Trevor"), who died after becoming entangled in the straps of a baby swing manufactured by Century Products Company ("Century")[1] and owned by Timolyn Fitzgerald ("Fitzgerald") of the Precious Angels Daycare ("Precious Angels") in Indianapolis. Plaintiffs initially filed suit in state court against Graco, Fitzgerald, and Precious Angels. After Fitzgerald and Precious Angels were dismissed from the state court action upon stipulation of the parties, Graco removed the case to this Court on the basis of diversity. Plaintiffs assert that the baby swing was negligently designed, and that Graco negligently failed to correct the defect, warn of the danger, and adequately recall the swing. Graco seeks summary judgment on all

---

[1]By way of asset purchase, Graco assumed the liabilities, if any, arising out of the design or manufacture of the swing at issue.

of Plaintiffs' claims. In addition, Graco seeks to exclude the expert testimony of Dr. Johnston. For the reasons set forth herein, the Court **GRANTS** in part and **DENIES** in part Defendant's Motion for Summary Judgment, and **DENIES** Defendant's Motion to Exclude Expert Testimony.

## I. <u>BACKGROUND</u>

### A. THE LIL' NAPPER SWING

In 1991, Fitzgerald opened the Precious Angels Daycare in Indianapolis, Indiana. Def.'s Stmt. of Facts at 4.[2] From July 1994 through April 2, 2002, Precious Angels was run from Fitzgerald's home on Pilgrim Drive in Indianapolis. Id.

At some point in 1995, Fitzgerald bought an infant swing for her baby, Cara Fitzgerald, from Baby Superstore at Keystone at the Corner shopping center in Indianapolis. Id. at 4. The swing was a Century model Lil' Napper Plus Battery Powered Swing ("Lil' Napper Swing"), Model No. 12-476, manufactured in 1995. Id. The Lil' Napper has an A-frame construction with a seat that is suspended from two bars. Id. A motorized, battery-powered assembly sits atop the A-frame and moves the seat forward and backward in a swinging motion. Id. According to Fitzgerald, the Lil' Napper Swing was fully assembled at the time of purchase, except for portions of the Lil' Napper Swing's legs. Id. The harness restraint for the Lil' Napper Swing was pre-assembled by the

---

[2]Defendant has made numerous objections to Plaintiffs' evidence, mainly on the basis of relevancy, foundation, and lack of support in the record. Plaintiffs submitted a memo addressing the foundation objections, and the Court is satisfied that Plaintiffs will be able to lay the foundation and properly authenticate the challenged evidence at trial. With regard to Defendant's lack of support in the record objections, the Court has reviewed the challenged depositions and added the relevant portions to this fact section. Plaintiffs have not responded to many of the Defendant's other evidentiary objections, and the Court will defer a ruling on those issues until the parties have briefed them in more depth in motions in limine. Plaintiffs have raised a jury question on summary judgment even without all of the challenged evidence.

manufacturer. Id. Fitzgerald did not check to see whether the manufacturer or retailer had misassembled the harness. Pl.'s Stmt. of Facts ¶ 92. However, there was no knot tied on the back of the Lil' Napper Swing when Fitzgerald bought it in 1995. Fitzgerald Depo. at 44.

The harness restraint system consists of an inch-wide strap which is placed over each shoulder, and extends down the child's torso to the buckle latch located between the child's legs. Id. at 5. The Lil' Napper Swing includes a plastic "harness tie," which is designed to draw together and position in front of the child the two separate portions of the harness straps that extend over each of the child's shoulders while seated in the swing. Id. The harness tie is placed on the child's chest at approximately three inches below the child's chin to prevent the harness straps from slipping off the child's shoulders. Id.

The Lil' Napper Swing also includes a "plastic strap slide" that connects the two ends of the harness strap on the back side of the seat. Id. at 5. A Lil' Napper Swing owner can tighten or loosen the harness restraint on the child by adjusting the straps through the strap slide. Id.

Fitzgerald lent her Lil' Napper Swing to a friend from 1998 to 2002. Fitzgerald Depo. at 78. When it was returned to Fitzgerald in 2002, it did not appear to have been modified in any way. Id.

## B. THE INCIDENT

On April 2, 2002, Trevor attended daycare at Precious Angels. Def.'s Stmt. of Facts at 6. That morning, Fitzgerald placed Trevor in the Lil' Napper Swing, which was set up in the dining room on the upper floor of her bi-level home. Id. at 7. Fitzgerald testified that she placed Trevor in the Lil' Napper Swing "to put him out of the way while [she] fixed breakfast for the other children." Id. After putting Trevor in the Lil' Napper Swing, Fitzgerald left the dining room, and

entered the kitchen that adjoined the dining room and made breakfast for other children attending Precious Angels. Id. Fitzgerald testified that Trevor was properly secured when she put him in the swing that day, and that the harness straps did not require any adjustment. Fitzgerald Depo. at 79. During the entire period that she was fixing breakfast, Trevor was within Fitzgerald's sight and only a few feet away from her on the other side of the counter. Pl.'s Stmt. of Facts ¶ 23. The crime scene specialist who subsequently gathered evidence at the scene of the occurrence photographed the area and confirmed that the swing was located where it would have been in plain sight while Fitzgerald was in the kitchen fixing breakfast. Id. ¶ 24. Fitzgerald then went downstairs to the family room/daycare of her house to feed the children playing there. Id. Fitzgerald testified that she was downstairs where she could not see Trevor for a maximum of seven minutes. Pl.'s Stmt of Facts ¶ 26. Fitzgerald subsequently returned upstairs to find Trevor hanging by his neck from the harness straps. Id.

Trevor died on April 4, 2002, as a result of injuries he sustained from being entangled in the harness straps on April 2, 2002. Def.'s Stmt. of Facts at 7. Trevor was eight months and one day old at the time of his death. Pl.'s Stmt. of Facts ¶ 17.

Dr. Sichting, the pediatric Intensive Care Unit physician who treated Trevor prior to his death, testified that Trevor could have been deprived of oxygen for anywhere between six to thirty minutes. Sichting Depo. at 41-48. Dr. Sichting based that opinion on Trevor's medical condition when she treated him on April 2, 2002. Id. Based on the medical literature she was aware of, Dr. Sichting also testified that Emergency Medical Technicians have been able to revive (through CPR) people who have deprived of oxygen for as long as sixty minutes. Id. Dr. Hawley, the physician who performed an autopsy on Trevor, testified that Trevor had been found "fairly promptly after the

hanging occurred." Hawley Depo. at 18. Dr. Hawley opined that Trevor would not have survived two days in the hospital if he had not been found soon after the neck entrapment. Id. at 14.

## C. CONDITION OF THE LIL' NAPPER SWING ON APRIL 2, 2002

On April 2, 2002, Officer James Meyer ("Meyer") of the Sheriff's Crime Lab inspected Precious Angels and the Lil' Napper Swing. Def.'s Stmt. of Facts at 7. Relying on his photographs of the Lil' Napper, Meyer testified that the harness straps had been tied together in a fixed knot on the seatback. Id. Koziatek, Defendant's expert, opined that the fixed knot made it impossible to tighten and properly fit the harness straps to Trevor. Def.'s Stmt. of Facts at 8. Meyer also reported that the harness restraint of the Lil' Napper Swing had been re-routed through the wrong slot in the back of the Lil' Napper Swing's seat. Id.

One of Meyer's photographs depicts a plastic object tied on the back of the swing with the harness straps, but it is unclear if the object depicted is the harness tie, the strap slide, or both. Def.'s Ex. 6. Meyer testified that he was not sure about the position of the harness tie before he disassembled the harness restraint. Meyer Depo. at 30.[3] When questioned about how she placed Trevor in the swing on the date in question, Fitzgerald testified that she did not remember seeing a device like the harness tie. Fitzgerald Depo. at 43-44.

## D. FITZGERALD'S GUILTY PLEA

The State of Indiana charged Fitzgerald with Felony Neglect of a child and operating a

---

[3]At certain points of the Meyer deposition, it is unclear which part of the harness restraint system Meyer and the lawyers are referencing.

daycare without a license. Def.'s Stmt. of Facts at 8. Fitzgerald reached a plea agreement with the

prosecutor's office, and pled guilty to felony neglect of Trevor Tober. Id. As part of the plea

agreement, the felony neglect charge was reduced from a Class B Felony to a Class D Felony. Pl.'s

Stmt. of Facts ¶ 35. The substantive difference between the two charges is that the Class D Felony

Neglect eliminates as an element of the charge that the occurrence "results in serious bodily injury."

Id. ¶ 36.

The plea agreement provided:

TIMOLYN FITZGERALD, on or about April 2, 2002, while having the care of
dependent, namely, Trevor Tober, a child whose date of birth was August 3, 2001,
did knowingly place Trevor Tober in a situation that endangered the life or health of
Trevor Tober, that is: left Trevor Tober unattended in a baby swing; all of which is
contrary to statute and against the peace and dignity of the State of Indiana.

Def.'s Stmt. of Facts at 8-9.[4]

## E. PRODUCT WARNINGS

Century places warning labels on all Lil' Napper Swings that state:

NEVER LEAVE CHILD UNATTENDED

ALWAYS KEEP CHILD IN VIEW EVEN WHILE SLEEPING

STAY WITHIN REACH OF YOUR CHILD

Def.'s Stmt. of Facts at 6.

Century includes an instruction manual with every Lil' Napper Swing that addresses the

harness restraint:

WARNING: Your baby must always be snugly fastened with the harness strap to

---

[4]Plaintiffs assert that the plea agreement is irrelevant and inadmissible. The Court
disagrees. The plea agreement is relevant to the issue of proximate causation.

prevent baby from falling out of swing.

IMPORTANT: The harness strap (M) must be thread through the plastic strap slide (P) exactly as shown in (Fig. 18). Tighten harness strap (M) by adjusting the harness strap around the strap slide (P).

Position harness tie (Q) approximately 8cm (3") below the child's chin to prevent harness straps (M) from slipping off child's shoulder (Fig. 19).

To remove your baby, slide harness tie towards buckle.

Def.'s Stmt. of Facts at 4-5. Century's instructions also caution the user: "Do not use if baby's weight exceeds 11.4kg (25 lbs) or if baby is too active." Id. at 6. Trevor weighed 22 lbs. at the time of the occurrence. Id. ¶ 75. The only identified consequence of using the product with a child who is too active is that the swing time will decrease. Id. ¶ 79. The only stated consequence of the failure to use the restraint system properly is that the battery life will be reduced. Id. ¶ 80. The installation instructions advise that the only hazard of improper fastening or fitting of the harness system is that the child might fall from the swing. Id. ¶ 83. There is no mention of any potential risk of entanglement or strangulation. Id.

The Lil' Napper also includes warning stickers attached to the bottom of the seat. Pl.'s Stmt. of Facts ¶ 87. The warnings refer to a "waist strap" and a "tech pouch," neither of which exists on the Lil' Napper. Id.

## F. PRODUCT DESIGN

The product at issue in this case is a Lil' Napper Swing. However, the Lil' Napper Swing is simply a renamed Lil' Rocker Swing with one modified feature. Sedlack Depo. at 13-14. The Lil' Rocker Swing seat was removable from the swing, and the feature proved to be unpopular with

consumers in part because it was not easy to do. Id. Century redesigned the attachment to the swing, and renamed the product the Lil' Napper. Id. at 14. Neither the seat shell nor the restraint harness was redesigned. Id. at 33.

Century originally designed the Lil' Rocker product in 1991. Pl.'s Stmt. of Facts ¶ 39. The Lil' Rocker was intended to be a low-end version of an existing Century product called the Kanga Rocka Roo. Id. The Kanga Rocka Roo consists of a shell seat made of molded plastic and a restraint system consisting of a waist belt and crotch strap. Id. ¶ 42

Mark Sedlack ("Sedlack") designed the Lil' Rocker restraint system for Century. Pl.'s Stmt. of Facts ¶ 54. Sedlack testified that he did not consider any stroller restraint system when he designed the shoulder restraint system for the Lil' Rocker. Sedlack Depo. at 55. Sedlack was not sure if Century's quality assurance department had run tests intended to evaluate the risk of entanglement in the shoulder harness of the Lil' Rocker. Id. at 77. Sedlack also stated that Century did not use a Kanga Rocka Roo-type waist belt and crotch strap restraint system for the Lil' Rocker because the Century Marketing Department had held focus groups which suggested that the waist belt and crotch strap restraint system was cumbersome and because the Marketing Department suggested using an over-the-head, three-point harness similar to the ones used in infant car seats. Id. at 66-67.

### G. OTHER STRANGULATIONS ASSOCIATED WITH LIL' NAPPER

In late 1993, two years before Fitzgerald purchased her Lil' Napper, Century received a written report of a strangulation death occurring in shoulder harness restraint system of a Lil' Napper. Pl.'s Stmt. of Facts ¶ 64. Century discussed the issue at a product review committee

meeting in January 1994. Pl.'s Ex. 9. Century did not make any changes to Lil' Napper's restraint system. Sedlack Depo. at 88.

By 1997, Century and the United States Consumer Product Safety Commission ("CPSC") were aware of three deaths and one near-strangulation that occurred when children from six to nine months old became entangled with the Lil' Napper harness straps around their neck. Pl.'s Ex. 13. Century and the CPSC decided that it was necessary to recall the Lil' Napper swings to replace the shoulder harness with a waist and crotch restraint system. Id. The recall notice explained:

> In cooperation with the U.S. Consumer Product Safety Commission (CPSC), Century Products Company of Macedonia, Ohio, is voluntarily providing a free repair kit for about 125,000 Century Lil' Napper infant swings. These swings have shoulder harness straps that are placed over each shoulder and buckled between the child's legs. If the straps on these swings loosen or are unbuckled, a child can become tangled in the straps and strangle. . .
>
> Century is offering a free repair kit, consisting of a new seat pad with a restraint system with waist and crotch straps, and installation instructions.

Pl.'s Ex. 13.

One of the recall notices stated:

> **IMPORTANT**: To prevent strangulation, the enclosed waist and crotch strap and seat pad must be installed on your swing.

Pl.'s Ex. 13.


### III. DISCUSSION

Graco asserts that it is entitled to summary judgment for two reasons: (1) the Lil' Napper was unforeseeably altered and these alterations were the sole proximate cause of Trevor's fatal injuries; and (2) Fitzgerald misused the Lil' Napper swing in a manner not reasonably foreseeable to Graco.

According to Graco, both alteration and misuse are complete defenses under Indiana law. Graco also challenges Plaintiffs' negligent recall claim as not having a basis in law or fact, and seeks to bar the opinions of Plaintiffs' expert under Rule 702 of the Federal Rules of Evidence.

In response, Plaintiffs maintain that the claimed modifications/alterations of the Lil' Napper may have occurred before the swing was delivered to Fitzgerald, and that the relevant photographs are inconclusive about some of the alleged alterations. Plaintiffs also assert that even if Lil' Napper was altered, the alterations were not the proximate cause of Trevor's injuries. Plaintiffs further assert that the instructions concerning the assembly of the harness system were inadequate. In addition, Plaintiffs challenge Graco's definition of "misuse" and assert that Fitzgerald did not misuse the product. Plaintiffs also contend that the risk of injury to a child left unattended in the Lil' Napper was foreseeable, and that foreseeability is a question for the jury. Plaintiffs argue that Indiana recognizes a cause of action for failure to recall. Each argument will be addressed in turn.

## A. INDIANA PRODUCTS LIABILITY ACT

Indiana Code § 34-20-2-1 provides the grounds for products liability actions:

[A] person who sells, leases, or otherwise puts into the stream of commerce any product in a defective condition unreasonably dangerous to any user or consumer or to the user or consumer's property is subject to liability for physical harm caused by that product to the user or consumer or to the user's or consumer's property if:

> (1) that user or consumer is in the class of persons that the seller should reasonably foresee as being subject to the harm caused by the defective condition;

> (2) the seller is engaged in the business of selling the product; and

> (3) the product is expected to and does reach the user or consumer without substantial alteration in the condition in which the product is

sold by the person sought to be held liable under this article.

Id.[5]  In other words, Plaintiffs must prove: (1) that the product was "defective" and as a result "unreasonably dangerous;" (2) the defect existed at the time the product left Defendant's control; (3) the product was expected to and did reach the consumer without substantial alteration; and (4) the Plaintiffs' injuries were proximately caused by the defect in the product.  *See Moss v. Crosman Corp.*, 136 F.3d 1169, 1171 (7th Cir. 1998).    To establish that a product is "defective" within the meaning of Indiana's Product Liability Act, Plaintiffs must show either: (1) a manufacturing defect; (2) a design defect; or (3) a failure to warn.  *See id.*

### 1. <u>Substantial Alteration Defense</u>

Graco cannot be held liable for Trevor's injuries if the Lil' Napper was "substantially altered" from its original condition.  I.C. § 34-20-2-1(3).  Indiana courts have defined "substantial alteration" as any change to a product that increases the likelihood of a product malfunction.  *See, e.g., Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1339 (7th Cir. 1995).

Graco maintains that Fitzgerald's Lil' Napper was altered in the following ways:

1. The harness straps were knotted together in the back of the plastic seat instead of being routed through the plastic strap slide;

2. The harness tie was tied-off on the back of the swing rather than being positioned in front of the child to draw the straps together;

3. One of the two "D-rings" was missing and no longer anchored one of the harness straps to the seatback; and

---

[5]There does not appear to be any dispute that Indiana substantive law governs this action under Indiana's choice of law principles.  *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1016 (7th Cir. 2002) ("Indiana is a *lex loci delicti* state: in all but exceptional cases it applies the law of the place where the harm occurred.").

4. One of the harness straps was not threaded through the slot or channel on the seatback allowing for greater lateral movement of that harness strap.

Def.'s Memo in Support at 11. According to Graco, the above-listed alterations were the sole proximate cause of Trevor's injuries.

The Court will begin with the third alleged alteration – the missing D-ring – because Graco's brief is unclear with regard to the factual underpinnings of the allegation. Although Graco's statement of facts does not mention D-rings or explain the function of D-rings within the harness restraint, Graco asserts in its argument section that Fitzgerald's Lil' Napper was unforeseeably altered in that it only had one D-ring. Def.'s Memo in Support at 11. Because Graco fails to explain the function or necessity of a D-ring and fails to designate evidence in its statement of facts regarding the absence of a D-ring, the Court will not consider the alleged D-ring alteration for purposes of summary judgment.[6]

Plaintiffs also challenge whether Graco's second alleged alteration is supported by the record. Graco's second alleged alteration involves the plastic harness tie, which is designed to draw together and position in front of the child the two separate portions of the harness straps that extend over each of the child's shoulders while seated in the swing. The harness is placed on the child's chest at approximately three inches below the child's chin to prevent the harness straps from slipping off the

----

[6]Graco's brief does not explain if there is any difference between a D-ring and a plastic strap slide. From the pictures attached to the Declaration of David Galambos ("Galambos"), Graco's Manager of Manufacturing Compliance and Safety, a Lil' Napper strap slide resembles and appears to function like the strap slides on a typical bookbag, allowing the caretaker to tighten or loosen the harness. Def.'s Ex. 3. All of the evidence designated by Graco refers to the plastic strap slide in the singular. Galambos Dec. ¶ 12; Galambos exemplar photo (depicting a *single* plastic slide strap); Instruction Manual ("The harness strap (M) must be threaded through plastic strap slide (P) exactly as shown in (Fig. 18).").

child's shoulders. Graco asserts that the harness tie was tied-off in the back of the swing rather than being positioned in the front of the child to draw the shoulder straps together.

In support of its argument about the harness tie, Graco cites crime scene investigator Meyer's deposition, a photograph of the Lil' Napper Swing taken by Meyer on the day of the incident, and Fitzgerald's deposition. However, that evidence is unclear as to whether or not the harness tie was on the front or back of the swing when Trevor became entangled. The relevant photograph depicts a plastic object tied on the back of the swing with the harness straps, but it is unclear if the object depicted is the harness tie, the strap slide, or both. Def.'s Ex. 6. Meyer, the crime scene investigator who assembled evidence at Fitzgerald's home shortly after Trevor was injured, testified that he was not sure about the position of the harness tie before he disassembled the harness restraint. Meyer Depo. at 30. When questioned about how she placed Trevor in the swing on the date in question, Fitzgerald testified that she did not remember seeing a device like the harness tie. Fitzgerald Depo. at 43-44. In the Court's view, the evidence cited above does not conclusively establish that the harness tie was tied-off in the back of the swing when Trevor was injured.

Even if Graco had established that: (1) the harness tie was not positioned on Trevor's chest, (2) the straps were knotted on the back of the seat, and (3) one of the harness straps was mis-routed on the day of the incident, Graco has not established for the purposes of summary judgment that those changes were substantial alterations that were the sole proximate cause of Trevor's death. Fitzgerald testified that Trevor was properly secured when she put him in the swing that day, and that the harness straps did not require any adjustment. That testimony tends to undermine the emphasis that Graco places on the knot in the back of the seat. As noted by Plaintiffs, the fact that it would be more difficult to adjust the length of the harness straps if they were knotted as opposed to being

in a strap slide becomes less important if no adjustment was necessary for Trevor.   In addition,

Plaintiffs have submitted evidence of a Lil' Napper recall in 1997 due to strangulations associated

with the harness restraint system, and a jury may consider the recall evidence to be relevant on the

proximate causation issue.   Moreover, Graco assigns fault to Fitzgerald due to her negligence on

April, 2, 2002, but the record contains conflicting testimony about how long Fitzgerald left Trevor

alone in the Lil' Napper on that day, which may affect a jury's determination of the quantum of her

negligence.

Both the analysis above and the parties' briefs illustrate the particularly fact-sensitive nature

of this case, which is typical in a negligence action.   As the Indiana Supreme Court recently

emphasized:

> In negligence cases, summary judgment is rarely appropriate . . . This is because
> negligence cases are particularly fact sensitive and are governed by a standard of the
> reasonable objective person – one best applied by a jury after hearing all of the
> evidence.

*Rhodes v. Wright*, 805 N.E.2d 382, 387 (Ind. 2004) (reversing and remanding case for trial).   At

bottom, all of Graco's arguments on the alteration defense go to the issues of proximate causation

and foreseeability, which are almost always jury issues.   *See Bridgewater v. Econ. Eng'g Co.*, 486

N.E.2d 484, 487 (Ind. 1985) ("It is true that summary judgments are rarely granted in negligence

actions when the sole issue is either proximate cause or contributory negligence.").   Material issues

of fact, including questions about the exact condition of the swing when Trevor was injured and the

significance of any alterations of the swing, prevent the Court from deciding this case at the

summary judgment stage.   Accordingly, the Court **DENIES** Defendant's Motion for Summary

Judgment with respect to the alteration defense.

## 2. Misuse Defense

Section 34-20-6-4 provides an affirmative defense to a products liability claim when a product has been misused:

> It is a defense to an action under this article that a cause of the physical harm is a misuse of the product by the claimant or any other person not reasonably expected by the seller at the time the seller sold or otherwise conveyed the product to another party.

Id. Indiana courts have defined "misuse" as "use for a purpose or in a manner not foreseeable by the manufacturer." *Indianapolis Athletic Club v. Alco Standard Corp.*, 709 N.E.2d 1070, 1073 (Ind.Ct.App. 1999). "Foreseeable use and misuse are typically questions of fact for the jury to decide." *Barnard v. Saturn Corp.*, 790 N.E.2d 1023, 1028 (Ind.Ct.App. 2003). Graco bears the burden of proving that Fitzgerald misused the product in an unforeseeable manner. *See id.* at 1029.

Although "substantial alteration" and "misuse" are separate defenses under Indiana law, the concepts overlap. Indeed, Graco essentially relies on the same evidence to establish alteration and misuse. Graco's theory is that Plaintiffs altered the Lil' Napper, and that Fitzgerald's use of the product in an altered state amounted to misuse of the product. Regardless of the exact distinction between the concepts, it is clear that both defenses go to the issue of proximate causation/foreseeability. As the Court noted above, foreseeability is usually an issue for the jury. *See Leon v. Caterpillar*, 69 F.3d 1326, 1342 (7th Cir. 1995) (applying Indiana law) ("The key to a successful claim of misuse is whether the seller can prove that the misuse, from the seller's perspective, was not reasonably foreseeable. The foreseeability of an intervening misuse is usually a question for the jury.").

Graco has not convinced the Court that this is one of the rare negligence cases where

summary judgment is appropriate.[7]  Even if Graco has evidence of possible intervening causes (alteration, misuse, Fitzgerald's negligence), not every intervening cause will relieve a defendant from liability, and it is more appropriate for a jury to apportion fault after hearing all the evidence than it is for the Court to do so on summary judgment.  Accordingly, the Court **DENIES** Defendant's Motion for Summary Judgment with regard to the misuse defense.

One legal issue related to Graco's misuse defense warrants attention from the Court at this juncture.  Graco represents that misuse is a complete defense to a product liability claim in Indiana.  Def.'s Reply at 1.  The Court disagrees.  Since the advent of comparative fault regime in Indiana, courts that have explicitly considered the issue have held that the Indiana legislature intended to include the defense of misuse in the comparative fault scheme.  *See Barnard*, 790 N.E.2d at 1029 (concluding that misuse no longer acts as a complete defense and that it must be analyzed under the comparative fault scheme); *Chapman v. Maytag Corp.*, 297 F.3d 682, 688-89 (7th Cir. 2002) (affirming lower court's conclusion that misuse is not a complete defense under Indiana law).  The trier of fact will compare all fault at the appropriate time, including any fault attributable to misuse.

### 3. Failure to Recall Cause of Action

In their complaint, Plaintiffs allege that, "Graco negligently failed to (1) correct the defect, (2) warn of the danger, and (3) *adequately recall the swing*."  Comp. ¶ 16 (emphasis added).  Graco

---

[7]The cases cited by Graco in support of its arguments about alteration and misuse confirm that those issues are only decided on summary judgment where the evidence on causation is plain and undisputed.  *See, e.g., Barnard v. Saturn Corp.*, 790 N.E.2d 1023 (Ind.Ct.App. 2003) (granting summary judgment for defendant where car crushed owner who had used a spare tire jack to change oil); *Wolfe v. Stork RMS-Protecon, Inc*., 683 N.E.2d 264 (Ind.Ct.App. 1997) (granting summary judgment for original manufacturer/defendant where injury was caused by a replacement part that original manufacturer/defendant did not know about or manufacture).

argues that Indiana courts do not recognize a claim for "negligent recall." The Court agrees with Graco. In response to Graco's arguments, Plaintiffs do not cite to any Indiana state law cases that indicate the existence of a separate "negligent recall" cause of action, and the Court has not uncovered any support for their position. It would be not be appropriate for this federal court sitting in diversity to expand the boundaries of Indiana law. *See Moss*, 136 F.3d at 1173-74. In addition, Plaintiffs essentially admit that their negligent recall claim is nothing more than an extension of their failure to warn claim. Pl.'s Memo in Opposition at 29 ("This is the 'classic' post-sale duty to warn case."). The Court will not instruct the jury on an independent theory of negligent recall. To that extent, the Court **GRANTS** Defendant's Motion for Summary Judgment.

## B. MOTION TO EXCLUDE EXPERT TESTIMONY

Graco also seeks to exclude the expert testimony of Dr. Johnston as unreliable and irrelevant. In particular, Graco asserts that Dr. Johnston fails to rely on his background or experience to support his conclusions about the warnings and the recall. Graco also asserts that Dr. Johnston does not give any basis for his opinions about the Lil' Napper warnings and instructions, and contends that he does not explain the methodology he has used to come to his conclusions. Finally, Graco argues that Dr. Johnston's proposed testimony does not "fit" the facts of this case. In their opposition memo, Plaintiffs do not offer any of Johnston's opinions because "Defendant's summary judgment motion is based upon affirmative defenses that Defendant must establish." Pl.'s Opposition Memo at 34. Plaintiffs question the validity of challenging an expert in connection with a summary judgment motion where Plaintiffs did not designate any expert testimony. In addition, Plaintiffs contend that the same arguments Graco makes with respect to their expert should be used to exclude the

testimony of Graco's experts.

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702. In *Daubert v. Merrell Dow Pham., Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), the Supreme Court "charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just testimony based in science." Ad. Comm. Notes to FED. R. EVID. 702. *See also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167 (1999). "The basic approach to opinions, lay and expert, in these rules is to admit them when helpful to the trier of fact." Ad. Comm. Notes to FED. R. EVID. 704.

With those standards in mind, the Court turns to Dr. Johnston's expert report. Dr. Johnston is expected to testify that: (1) the Lil' Napper is defective and unreasonably dangerous as designed in that the restraint system is unsafe for the foreseeable environment of use of the swing; (2) Graco should have known that the Lil' Napper's restraint system was defective due to earlier accidents involving a similar harness on a Century stroller; (3) the Lil' Napper's warning labels and instructions are inadequate for a number of reasons; (4) Graco was negligent with respect to its recall notice; and (5) the defective swing and the negligence of Graco were contributing causes of the accident and resulting death of Trevor. Def. Exs. 17, 18.

As noted above, Graco challenges the reliability of Dr. Johnston's report by arguing that he

fails to rely on his background or experience to support his conclusions about the warnings and the recall. However, in the preamble to his opinions and conclusions, Dr. Johnston explicitly bases his opinions on his experience in Human Factors Engineering[8] and Product Safety Engineering, as well as his academic background and experience as an owner of infant specialty stores. Def.'s Ex. 17. A review of Dr. Johnston's expert report reveals that he has significant experience in those areas. Dr. Johnston has a Bachelor of Science degree in Mechanical Engineering, a Masters Degree in Industrial Engineering, and a Ph.D in Industrial Engineering, where his major specialty was human factors and ergonomics. Dr. Johnston was a professor at Texas A&M for twenty-four years, where he taught classes in Product Safety Engineering and Human Factors Engineering. During that period, he also gave seminars, conducted research in safety, and performed consulting services with industrial and governmental entities. Dr. Johnston has extensive experience relative to the design, marketing, use, and recall of children's products as a result of previously owning four infant specialty stores in Texas. Over the ten-year period when Dr. Johnston owned the infant specialty stores, he personally purchased, assembled, and sold numerous juvenile products, including infant swings, cribs, car seats, and infant carriers. Dr. Johnston has been retained in a number of legal matters involving infant products, including another Century swing case, and has examined the swing at issue in this case. Dr. Johnston's credentials in academia and in the juvenile products industry qualify him to opine about the subjects contained in his expert report.

Graco fares no better with its assertion that Dr. Johnston does not give any basis for his

---

[8]Human Factors Engineering is a specialty area of Industrial Engineering that focuses on the relationship between the human being and the equipment and/or facility. It takes into account the capabilities as well as the limitations of the human along with the characteristics of the equipment, machine or facility with attempts to make that relationship as efficient, effective, and safe as possible. Def.'s Ex. 17.

opinions about the Lil' Napper warnings and instructions. Dr. Johnston explains the basis for his opinion that the warnings were inadequate in seven short paragraphs in his first expert report, Def.'s Ex. 17 at 6, and then he expands on that explanation in his supplemental report. Def.'s Ex. 18. One more sentence here. Specifically, Dr. Johnston states that the warnings are inadequate because, inter alia, they lack necessary urgency or intensity, they fail to identify specific hazards and consequences of failure to follow the warnings, the warning label lettering is too small and lacks emphasis, the instructions about the harness restraint are unclear, and certain warnings do not apply to the Lil' Napper. Dr. Johnston has provided Graco with the basis for his opinion that the warnings are inadequate.

In addition, Graco's argument about Dr. Johnston's lack of methodology under the *Daubert* factors is inappropriate in this context. The inquiry envisaged by Rule 702 is a flexible one, and a strict application of the *Daubert* factors is not always warranted, especially when the expert relies on his experience in the relevant field. *See, e.g., Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000). Dr. Johnston is not providing scientific testimony that can be readily tested by the *Daubert* factors. Instead, Dr. Johnston relies on his extensive experience and expertise in the relevant field. Graco will have ample opportunity to test Dr. Johnston's opinions through the traditional methods at trial, including vigorous cross-examination and/or a motion for judgment as a matter of law.

Graco also makes a relevancy objection, arguing that Dr. Johnston's opinions do not "fit" the facts of this case. Dr. Johnston proposes to provide the jury with his opinion on the design of the Lil' Napper and about the adequacy of the product warnings. The adequacy of the Lil' Napper design and the accompanying product warnings are both central issues in this case. These matters

are beyond the ken of the average juror, and Dr. Johnston's technical knowledge in the area will assist the jury to understand the issues in this case. Accordingly, the Court **DENIES** Defendant's Motion to Exclude the Expert Testimony of Dr. Johnston.

## IV. CONCLUSION

For the reasons stated herein, the Court **GRANTS** in part and **DENIES** in part Defendant's Motion for Summary Judgment. In addition, the Court **DENIES** Defendant's Motion to Exclude Expert Testimony. Further, the Court **DENIES** Defendant's Motion for Oral Argument on Motion for Summary Judgment.

IT IS SO ORDERED this 28th day of July, 2004.

LARRY J. McKINNEY, CHIEF JUDGE
United States District Court
Southern District of Indiana

Electronically distributed to:

James R. Fisher
ICE MILLER
james.fisher@icemiller.com

Debra H. Miller
ICE MILLER
miller@icemiller.com

Andrew J. Mallon
LOCKE REYNOLDS LLP
amallon@locke.com

Francis P. Morrissey
SCHIFF HARDIN & WAITE
fmorrissey@schiffhardin.com

Michael T. McNally
ICE MILLER
mcnally@icemiller.com

Kevin C. Schiferl
LOCKE REYNOLDS LLP
kschiferl@locke.com